# United States Court of Appeals
## For the First Circuit
---

No. 98-1567
No. 99-1111

UNITED STATES OF AMERICA,

Appellee,

v.

ANTHONY M. SHEA,

Defendant, Appellant.

————————————

No. 98-1568
No. 99-1110

UNITED STATES OF AMERICA,

Appellee,

v.

MICHAEL K. O'HALLORAN

Defendant, Appellant.

————————————

No. 98-1569
No. 99-2009

UNITED STATES OF AMERICA,

Appellee,

v.

PATRICK J. McGONAGLE,

Defendant, Appellant.

————————————

_____

No. 98-1570
No. 99-1109

UNITED STATES OF AMERICA,

Appellee,

v.

STEPHEN G. BURKE,

Defendant, Appellant.
_____

No. 98-1767
No. 99-1204

UNITED STATES OF AMERICA,

Appellee,

v.

MATTHEW McDONALD,

Defendant, Appellant.
_____

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

_____

Before

Boudin, Lynch and Lipez,

Circuit Judges.

_____

Bruce E. Kenna, by appointment of the court, with whom Kenna, Johnston & Sharkey, P.A. was on consolidated brief for appellant Patrick J. McGonagle.

Robert L. Sheketoff, by appointment of the court, with whom Sheketoff & Homan was on consolidated brief for appellant Stephen Burke.

Judith H. Mizner, by appointment of the court, for appellant Matthew McDonald.

Michael J. Iacopino, by appointment of the court, with whom Brennan, Caron, Lenehan & Iacopino was on consolidated brief for appellant Michael K. O'Halloran.

Michael K. O'Halloran on supplemental pro se brief.

Bjorn Lange, Assistant Federal Defender, Federal Defender Office, for appellant Anthony M. Shea.

David A. Vicinanzo, First Assistant United States Attorney, with whom Paul M. Gagnon, United States Attorney, Jean B. Weld, Donald Feith and Terry Ollila, Assistant United States Attorneys, were on brief for the United States.

---

May 2, 2000

---

BOUDIN, Circuit Judge. This appeal grows out of a second superseding indictment returned in New Hampshire on May 1, 1997, charging six defendants with a variety of federal offenses related to a string of bank and armored car robberies that took place between 1990 and 1996. The trial began on September 16, 1997, one defendant pled guilty during trial, and the remaining five defendants completed the three-month trial, were convicted and are appellants in this court: they are Anthony Shea, Stephen Burke, Matthew McDonald, Patrick McGonagle and Michael O'Halloran.

The evidence presented at trial included a wealth of exhibits as well as testimony by over 150 witnesses. In substance, the evidence showed that Shea, McDonald and one Dick Donovan had carried out a series of bank robberies beginning in 1990; that by 1992 Stephen Burke and O'Halloran had joined the scheme, together with Burke's brother John (who pled guilty at trial). From 1992 onward, the group concentrated on armored car robberies (with an occasional bank robbery) in the Northeast and Florida. The most notorious incident was a Hudson, New Hampshire, armored car robbery in August 1994, in which both armored car drivers were kidnaped and executed.

The government's case was substantially aided by the testimony of Steven Connolly, who was a longtime friend of two

of the defendants and an acquaintance to the others. He had been recruited into the scheme in March 1994 and provided testimony, including descriptions of defendants' conduct in various of the offenses, their techniques, and admissions made by individual defendants. A number of other government witnesses, some unwilling, also described admissions by individual defendants to various of the robberies.

The government charged two armored car robberies--those that had occurred in New Hampshire--as substantive offenses, and it offered proof of a number of other bank or armored car robberies as predicate acts or evidence to support the charges that some or all of the defendants were engaged in a racketeering enterprise under the RICO statute, a RICO conspiracy, conspiracy to rob banks, carjacking, and several different kinds of firearms offenses. 18 U.S.C. §§ 371, 922(g)(1), 922(g)(3), 924(c), 1951, 1962(c)-(d), 2113(d), 2119 (1994). The two New Hampshire robberies, including the August 1994 Hudson robbery and another that occurred in Seabrook in May 1993, were the subject of extensive evidence.

About two months into the trial, the district court (with the government's agreement) granted a judgment of acquittal on several counts and one racketeering act as to certain of the defendants and one racketeering act as to all of

the defendants. The remaining counts, minus particular racketeering acts and overt acts as to which no evidence was presented, were eventually submitted to the jury under a redacted indictment now containing 14 counts and on December 22, 1997, the jury convicted all five defendants on all submitted charges, save that it acquitted McGonagle of carjacking in relation to the Hudson robbery.

All five of the defendants were convicted of conspiracy to commit armed robberies and of committing and conspiring to commit the Hudson robbery. All of the defendants except McGonagle were convicted of operating a racketeering enterprise, engaging in a racketeering conspiracy, carjacking in connection with the Hudson robbery, and of various firearms offenses. Shea, Burke and O'Halloran were also convicted of committing and conspiring to commit the Seabrook armored car robbery.

On May 8, 1998, the court imposed sentences on each of the defendants. Each was sentenced to life imprisonment, except for McGonagle, who was sentenced to 360 months. The defendants have now appealed, presenting a series of claims concerning sufficiency of evidence as to certain counts, pretrial and trial rulings, the composition of the jury and the instructions given to it, and sentencing and other post-trial matters.

Sufficiency.  On several claims, individual defendants say that the evidence was insufficient for a reasonable jury to convict, and that their motions for a judgment of acquittal should have been granted.  Review of such claims is de novo, United States v. Ruiz, 105 F.3d 1492, 1495 (1st Cir. 1997), and the evidence is considered in the light most favorable to the prosecution.  United States v. Echeverri, 982 F.2d 675, 677 (1st Cir. 1993).  By this standard, the evidence in each case was adequate on the contested counts (and on many others it was overwhelming).

McGonagle does not contest that the evidence was sufficient to convict him of bank robbery and conspiracy to commit the Hudson robbery, but he says that the evidence was insufficient to tie him to a broader conspiracy to commit a series of armed robberies--a crime of which all defendants were convicted.  However, Connolly testified that Shea had identified McGonagle as one of the conspirators in the broader conspiracy and, in addition to the ample evidence of McGonagle's role in the Hudson robbery, there is evidence that linked him to a separate armored car robbery by the conspirators almost eight months before the Hudson robbery.  At least two witnesses, in addition to Connolly, testified to McGonagle's role.

McDonald, joined by O'Halloran and Burke, says that the government failed to prove the existence of a single racketeering enterprise, racketeering conspiracy, or a broad conspiracy to commit armed robbery; at best, he contends, the jury could only have found smaller enterprises or conspiracies with a changing cast of conspirators. No magic formula exists for determining when a set of jointly committed crimes adds up to an overarching conspiracy or enterprise; the courts tend to look for common goal, overlap among participants, and a measure of interdependence, United States v. Portela, 167 F.3d 687, 695 (1st Cir.), cert. denied, 120 S. Ct. 273 (1999); and a general scheme may exist "notwithstanding variations in personnel and their roles" over time. United States v. Bello-Perez, 977 F.2d 664, 668 (1st Cir. 1992).

Here, the evidence supported, and the jury necessarily found, that while the cast of characters changed over time, there was nevertheless one overarching conspiracy. Shea was involved from the beginning, and he and Burke were involved in the largest number of crimes. There was also evidence that McDonald was involved in the conspiracy from its inception and that he and O'Halloran were substantially involved in the overarching racketeering conspiracy and enterprise and a broad conspiracy to commit armed robbery. Despite an interruption in

McDonald's role caused by his temporary imprisonment on a parole violation, and O'Halloran's somewhat late arrival in the scheme, enough evidence existed of a common and continuing aim, similar methods of operation, continuity in personnel, and interdependence to permit the court to send the separate counts to the jury and the jury to find a RICO enterprise, a RICO conspiracy, and a broad conspiracy to rob banks and armored cars.

McDonald was convicted of three different gun charges (felon-in-possession, drug user-in-possession, and use and possession during a violent crime) relating to the Hudson armored car robbery. He says that the evidence was insufficient on these counts. However, constructive possession is sufficient. United States v. Wight, 968 F.2d 1393, 1397-98 (1st Cir. 1992). Here the evidence showed that the defendants as a group were regularly armed. In addition, a government witness testified that two days before the Hudson robbery, McDonald said that he was going to take part in it and displayed a handgun at the same time; and at least six weapons were used in the Hudson robbery.

O'Halloran, who was convicted of firearms charges in connection with both the Hudson and Seabrook robberies, makes a similar claim that the evidence was insufficient. Again, the

-11-

constructive possession theory was available to the government and was supported by the evidence. In addition, there was testimony by government witnesses to support the view that O'Halloran had himself possessed weapons in both of the robberies. The lower court did not err in sending the firearm counts to the jury.

Specific evidence. We turn next to objections to particular pieces of evidence, starting with Shea's objection to the use at trial of a number of items seized in a January 1990 search of his Charlestown residence (including weapons, a bulletproof vest, camouflage clothing, and masks). The search was based on a warrant secured through an affidavit given by a federal agent; its gist was information furnished by an informant, whose prior information had been reliable, that on three occasions over the six weeks prior to the affidavit the informant had seen a sawed-off shotgun at the residence where Shea was present. The affiant also said that Shea had no required federal registration for possessing a sawed-off shotgun.

The district court relied on the good faith exception to the exclusionary rule, United States v. Leon, 468 U.S. 897, 922-25 (1984), in finding that reliance on the warrant was objectively reasonable, even if the application was defective.

-12-

We review probable cause determinations de novo, Ornelas v. United States, 517 U.S. 690, 699 (1996), and the same standard applies to Leon determinations, United States v. Procopio, 88 F.3d 21, 28 (1st Cir.), cert. denied, 519 U.S. 1046 (1996). Shea says that there is a lack of detailed information about the circumstances in which the informant saw the shotgun and, further, that there is no explicit basis for the assertion in the affidavit that Shea resided at the address in question.

The reliability of the informant was amply established by the described record of prior assists, and we see no reason in these circumstances why the informant's straightforward description of seeing the shotgun in the apartment in Shea's presence on three different recent occasions needed to be embellished by further detail. Admittedly, the affidavit does not make clear how the informant (or the affiant) knew that Shea resided at the apartment, which might or might not be viewed as the necessary link in the chain. To the extent it is such a link, the failure to spell out the basis for associating Shea with the address is a minor error (and not infrequently so, Procopio, 88 F.3d at 28); given that the informant said he had seen Shea on the premises on three occasions, the gap in proof is sufficiently small, if a gap there is, that Leon amply applies.

-13-

Shea also challenges the use of evidence derived from a search of his vehicle on August 11, 1995, during Shea's attempted but aborted robbery of a bank in Wakefield, Massachusetts--which Shea carried out independently of the enterprise and conspiracies charged in this case. The evidence seized included weapons and other paraphernalia. Shea also objects to fragments of testimony, elicited primarily by co-defendants, suggesting Shea's connection with the Wakefield incident. Shea says that the cumulative effect was to retry him for the Wakefield attempted robbery after he had already been convicted of it in a separate trial, see United States v. Shea, 150 F.3d 44 (1st Cir.), cert. denied, 525 U.S. 1030 (1998), and that this violated his constitutional rights (e.g., under the Double Jeopardy Clause).

Evidence of "other crimes" relevant to proving the crime charged is not subject to the double jeopardy or other constitutional objections made by Shea, United States v. Felix, 503 U.S. 378, 386-87 & n.3 (1992), nor is it subject to limitations on use of character evidence, if it is offered for some purpose other than to prove character. See Fed. R. Evid. 404(b). Here, the weapons seized from Shea during the Wakefield attempt were directly relevant to the racketeering and conspiracy charges because the evidence showed that they were

-14-

previously used by Shea and Burke in a July 28, 1995, bank robbery at Fall River, Massachusetts, which is one of the predicate acts in the racketeering count charged in the present case.

It is less clear how the government justified its introduction of other evidence seized from Shea's car (e.g., a walkie-talkie and police scanners) apparently not linked to a charged act or offense (the government's brief is suspiciously silent on this point). But Shea's objections at trial seemingly did not pinpoint the relevance objection, Fed. R. Evid. 103(a)(1), and in any event the evidence, even if improperly admitted, was harmless in light of the guns and the other substantial evidence offered against Shea. See United States v. Benavente Gomez, 921 F.2d 378, 386 (1st Cir. 1990).

A few brief testimonial references to Shea's connection to the Wakefield incident were elicited at trial, primarily by co-defendants seeking to support their multiple conspiracies defense (by showing that Shea engaged in robberies on his own or with other persons who were not defendants in this case). However, these references were fleeting, and the district judge, who had sought to restrict references to Wakefield, did not err in refusing to grant a mistrial on this basis.

Shea also claims error in the district court's refusal to suppress statements made by Shea, incriminating himself in the Hudson robbery, to one James Ferguson, with whom Shea was incarcerated in 1995 in connection with the Wakefield robbery. At that time, Ferguson was a government informant wearing a listening device and, because Shea was then represented by counsel on the Wakefield robbery, he says that the eliciting of incriminating statements as to the Hudson robbery violated his Sixth Amendment right to counsel during the custodial interrogation.

The government's answer, which is adequate, is that at the time the statements were obtained, Shea had not been charged with the Hudson robbery and his right to counsel with respect to that robbery had not yet "attached." See McNeil v. Wisconsin, 501 U.S. 171, 175-76 (1991); United States v. LaBare, 191 F.3d 60, 64 (1st Cir. 1999). This argument is an accepted counter to such claims, United States v. Nocella, 849 F.2d 33, 36-38 (1st Cir. 1988), and there is no indication that the Supreme Court contemplates an expansion of the Sixth Amendment right to counsel.

In a separate argument, McDonald challenges the district court's refusal to suppress DNA evidence that derived from blood, saliva and hair samples taken from him pursuant to

a December 29, 1994 warrant.  The DNA was matched with DNA from saliva left at the scene of a February 1992 robbery in Newton, Massachusetts, which was one of the racketeering acts charged in the indictment.  McDonald says that the affidavit supporting the warrant application failed to establish probable cause and rested on material misrepresentations.

Aside from the alleged misrepresentations, the evidence described in the warrant was more than sufficient to establish probable cause to believe that McDonald was involved in the robbery.  The story as to the alleged misrepresentation is complicated:  the affidavit relied on a supposed match between a fiber found on McDonald's clothing and the fibers from the carpet of one of the vehicles used in the Hudson robbery. McDonald says the match was overstated or utterly irrelevant. But we need not resolve the issue, since the remaining connections between McDonald and the crime were ample to support the affidavit without regard to the fiber evidence.  Franks v. Delaware, 438 U.S. 154, 171-72 (1978).

Burke makes an argument, adopted by McDonald, Shea, and O'Halloran, that the district court erred in permitting a government expert (Dr. Harold Deadman) to testify as to matches between DNA from blood samples of Burke and McDonald and several pieces of physical evidence found at different crime scenes.

The attack on the Deadman testimony rested on this expert's failure to note one faint allele dot in a sample of sweat taken from a baseball cap found in a getaway vehicle, the DNA of which Dr. Deadman matched to Burke's blood sample. This, in turn, led to an arguable contradiction in Deadman's initial explanation of his basis for the match, although Dr. Deadman then provided a defense of his position at trial.[1]

The district court conducted a lengthy hearing on admissibility of the DNA evidence under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592 (1993), and held that any flaws in Dr. Deadman's application of an otherwise reliable methodology went to weight and credibility and not to admissibility. Most circuits that have spoken have agreed with this approach, see, e.g., United States v. Johnson, 56 F.3d 947,

---

[1]At the pre-trial Daubert hearing, Dr. Deadman testified that the DNA testing he performed on the sweat from the cap matched Stephen Burke's blood sample. His opinion was based on his belief that only a "B" allele dot was present in the sweat along with his knowledge that Burke's blood sample was typed as a "BB." On cross-examination, he indicated that, as a general matter, he would not usually conclude that a match was made if a visible weak dot of a different type was mixed in. Subsequent to this testimony, an expert for the defense, Dr. Randell Libby, noted the presence of a faint "A" allele dot that Dr. Deadman had not previously noticed, and argued that such a mixture prevented a conclusion of a match to an individual typed as "BB." Dr. Deadman acknowledged the existence of the weak "A" allele dot and his failure initially to identify it. But he stated that the presence of a mixture would not--in light of the faint intensity of the "A" allele dot--alter his conclusion of a match with Stephen Burke's DNA.

952-53 (8th Cir. 1995), relying on the view that "cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" is the proper challenge to "shaky but admissible evidence." Daubert, 509 U.S. at 596. The district court did not abuse its discretion in admitting the Deadman evidence. United States v. Lowe, 145 F.3d 45, 50-51 (1st Cir.), cert. denied, 525 U.S. 918 (1998).

A final dispute as to tangible evidence concerns a latent thumb print matching defendant Burke that was allegedly lifted from a truck leased by McGonagle and used in the Hudson incident. The print was dusted but not lifted during the first inspection of the truck (it was concealed because a door was open), and Burke argued at trial that the print later lifted came from a different truck and that the government, by returning the truck to the owner after its collection of prints was complete, had prevented him from proving this definitively.

Although Burke calls the return of the truck "spoliation," the government explained both the delay in lifting the print and the return of the truck, and there is no basis for imputing bad faith to the government--a usual precondition to a spoliation claim in "missing evidence" cases. United States v. Femia, 9 F.3d 990, 994 (1st Cir. 1993). There may be extraordinary cases where the government's loss of evidence

-19-

requires some remedy despite good faith, <u>cf.</u> <u>United States</u> v. <u>Alston</u>, 112 F.3d 32, 35 (1st Cir.), <u>cert. denied</u>, 522 U.S. 999 (1997), but police do not usually preserve intact a site from which prints are lifted and Burke was free to argue his wrong truck theory based on photographs that were available.

<u>Hearsay</u>.  At trial, various friends or associates of the defendants testified to incriminating out-of-court statements made by individual defendants; these were, of course, admissions as to the makers, Fed. R. Evid. 801(d)(2)(A), but hearsay as to the other defendants unless--as the district court held--they were admissible against the other defendants as co-conspirator statements, Fed. R. Evid. 801(d)(2)(E), or under the exception for statements against penal interest, Fed. R. Evid. 804(b)(3).  Appellants claim that the rule-based preconditions were not met or that the Confrontation Clause provided an independent basis for limiting admissibility.

Only Shea argues on appeal that certain of the statements admitted were not in furtherance of the conspiracy and therefore not within the co-conspirator exception.  The statements in question, which we need not recite, were seemingly made for such purposes as recruiting new members into the conspiracy or passing information between conspirators.  The district court did not commit clear error, <u>United States</u> v.

<u>Patterson</u>, 644 F.2d 890, 894 (1st Cir. 1981), in finding that these statements were, more probably than not, made during and in furtherance of the conspiracy. <u>United States</u> v. <u>Petrozziello</u>, 548 F.2d 20, 23 (1st Cir. 1977).

Similarly, the statements challenged by Shea, McDonald, McGonagle, and O'Halloran that were admitted as against their penal interest fell within that rule or at least the district court committed no error in so finding under then-existing precedent. <u>See</u> <u>Williamson</u> v. <u>United States</u>, 512 U.S. 594, 599-601 (1994); <u>United States</u> v. <u>Barone</u>, 114 F.3d 1284, 1296 (1st Cir.), <u>cert. denied</u>, 522 U.S. 1021 (1997). The more important question is whether anything is altered by the Supreme Court's subsequent decision in <u>Lilly</u> v. <u>Virginia</u>, 119 S. Ct. 1887 (1999). <u>Lilly</u> disallowed the out-of-court statement of the defendant's brother who, under police questioning, conceded that he was involved in a shooting but identified the defendant as the triggerman; the court reasoned that the statement did not fall within a "firmly rooted" exception to the hearsay rule and failed under the Confrontation Clause. <u>Id.</u> at 1899.

<u>Lilly</u>'s main concern was with statements in which, as is common in police-station confessions, the declarant admits only what the authorities are already capable of proving against him and seeks to shift the principal blame to another (against

-21-

whom the prosecutor then offers the statement at trial).  119 S.
Ct. at 1901.  While Lilly's full reach may be unclear--there was
no single "majority" opinion--it does not in our view affect the
admissibility of the statements at issue here:  all those
identified in this case were made to friends or companions, not
to the police, and were not of the "blame shifting" variety.
Barone, 114 F.3d at 1302.

The district court also admitted these statements on
the alternative ground (so far as the Confrontation Clause is
concerned) that they were attended by "particularized guarantees
of trustworthiness."  Ohio v. Roberts, 448 U.S. 56, 66 (1980).
The district judge referred specifically to Roberts and the
assessment required by Barone to determine whether a statement
falls within a firmly-rooted exception to the hearsay rule.
Thus, even if Lilly is more far reaching than we think likely,
it would not affect the outcome here.

Miscellany.  There remain various other trial
objections which we take largely in chronological order.  Four
of the defendants argue that the jury-selection process was
flawed because the district court failed to empty and refill the
master jury wheel on a timely basis.  The Jury Selection and
Service Act of 1968, 28 U.S.C. § 1861 et seq. (1994), requires
that "emptying and refilling" be done periodically, "the

-22-

interval for which shall not exceed four years." Id. §
1863(b)(4). The aim is to ensure that the jury comes from a
"fair cross section of the community" determined by reasonably
recent data. Id. § 1861.

In the New Hampshire jury selection plan, new names are
collected every four years following a general election from the
latest New Hampshire voter registration lists and from current
driver license records; but to provide time to collect and
organize, the plan provides for emptying and refilling every
four years "within nine months" following the general election
in November. In this case, the chronology is as follows:

> •June 16, 1993: list compiled based on 1992
> elections
>
> •August 1, 1993: list put into effect
>
> •July 24, 1997: list used to mail summonses
> to  jurors for defendants' jury

The defendants say that the list used to select their
jury had existed for more than four years prior to the date that
it was used to select their jury (June 16, 1993 to July 24,
1997) and so violated the statute's four-year provision. The
district court has read the statute's four year provision to
require that the wheel be emptied and refilled within four
years, and that the list used for defendants' jury had been used
for less than four years (August 1, 1993 to July 24, 1997). The

-23-

issue is what the statute means, an issue as to which review is de novo. United States v. Royal, 174 F.3d 1, 5 (1st Cir. 1999).

The district court's reading is literally accurate--the names in the wheel had not been used for more than four years--but it does not meet a related concern, namely, that the data itself be reasonably fresh when put into use. The jury in this case was selected based on data more than four years old (the November 1992 election lists). But the New Hampshire plan reasonably answers this concern by requiring that the wheel be refilled within nine months after the general election, and the statute does not preclude a reasonable delay between the collection of the data and its insertion into the wheel.

Defendants also assert that the "random" selection requirement of the statute was frustrated because the use of data more than four years old necessarily reduced the number of both younger jurors and jurors who had recently relocated to New Hampshire. But for sound practical reasons the Supreme Court has essentially rejected the "young persons" claim, Hamling v. United States, 418 U.S. 87, 137-38 (1974); and while later data might include more recent immigrants to New Hampshire, there is nothing in the circumstances of this case to show that recent immigrants to the state were the kind of distinctive group whose slightly reduced representation comprised a violation of the

-24-

statute or the Sixth Amendment.  <u>Duren</u> v. <u>Missouri</u>, 439 U.S. 357, 364 (1979).

The next jury selection issue is Shea's objection, now joined by other defendants, that one of the jurors should have been dismissed, primarily because she expressed fear of the defendants during a pair of voir dires conducted after jury selection.  Removal of a juror for cause is normally a fact-sensitive matter on which the district judge's on-the-scene judgment deserves great weight.  <u>See</u> <u>Williams</u> v. <u>Drake</u>, 146 F.3d 44, 50 (1st Cir. 1998); <u>United States</u> v. <u>Gonzalez-Soberal</u>, 109 F.3d 64, 69 (1st Cir. 1997).  We have reviewed the voir dire transcripts and, without recounting the facts in detail, are satisfied that the district court did not abuse its discretion. <u>Cf.</u> <u>Gonzalez-Soberal</u>, 109 F.3d at 69-70.

Finally, defendants' claim that the district court personnel acted outside their authority in dismissing those potential jurors who were acquainted with counsel in this case is without merit.  So long as the district court exercises general oversight, the delegation of excusal tasks to court personnel has long been approved of and encouraged.  <u>See</u> <u>United States</u> v. <u>Candelaria-Silva</u>, 166 F.3d 19, 31 (1st Cir. 1999); <u>United States</u> v. <u>Maskeny</u>, 609 F.2d 183, 193-94 (5th Cir. 1980); <u>United States</u> v. <u>Marrapese</u>, 610 F. Supp. 991, 1000-01 (D.R.I.

1985). The record shows that the trial judge approved of the court personnel excusing jurors on this basis; accordingly, there was no violation of the Act.

The defendants' next claim of error relates to the prosecutor's opening statement. In outlining the evidence, the prosecutor began not chronologically but with the most dramatic incident, the Hudson robbery and murder of the guards; his description was somewhat emotional; and, in the district judge's view, the prosecutor did not make it sufficiently clear (despite the court's admonitions) that the prosecutor's description of various events was a preview of intended evidence rather than an expression of personal belief. Finding that the latter offense was not willful, the district court limited its response to strong cautionary instructions.

O'Halloran, joined by other defendants, says that the district court should, as requested at the time, have granted a mistrial based on the opening statement. However, the district court's finding on willfulness is not clear error, the cautionary instructions were repeated and emphatic, and the district judge was best placed to assess the overall effect on the jury. The discretion accorded a judge on whether to grant a motion for mistrial is very broad and it was not abused here.

See United States v. Pierro, 32 F.3d 611, 617 (1st Cir. 1994), cert. denied, 513 U.S. 1119 (1995).

During trial, counsel for three of the defendants--Burke, O'Halloran and McDonald--sought on several occasions to cross- examine government witnesses to show that Shea had engaged in robberies independently of the others. Their asserted purpose was to show that the evidence made out at best multiple conspiracies for different robberies and not the overarching conspiracy and enterprise charged in the indictment. In particular, these defendants sought to show that Shea had been involved in and convicted for the robbery at Wakefield, a crime not involving the other defendants.

The district court refused to allow the other defendants to prove that Shea was arrested and convicted of the Wakefield robbery; seemingly, the court thought the evidence of little relevance to the multiple-conspiracy defense but highly prejudicial to Shea. On appeal, the three defendants complain that their right to cross-examine was unduly restricted. In the alternative, they say that the district court should have granted them a severance from Shea, which they requested, to permit them to develop this defense without prejudicing Shea.

The government says that the defendants now raising the claim did not press the multiple conspiracy argument before the

-27-

jury and have therefore waived their present claims, but this is not fully persuasive:  the defendants might have argued the point to the jury if they had been allowed to develop the evidence.  A better response, also offered by the government, is that they had no right to insist on cross-examining beyond the scope of the direct examination or beyond matters affecting credibility, Fed. R. Evid. 611(b); United States v. McLaughlin, 957 F.2d 12, 17 (1st Cir. 1992), but (among other possible replies) this would leave the denial of the severance request to be explained.

In our view, showing that Shea was convicted for a separate robbery in the same time frame had some relevance to the defense but not much; Shea's sideline ventures did not prevent him from also engaging in a broad conspiracy with the defendants, and proof of the latter turned primarily on how the jury assessed the relationship of the crimes in which the defendants participated.  We are thus dealing with one primary episode that is marginal as to the three defendants' defense but highly prejudicial as to Shea.

The right of cross-examination is important but can be reasonably limited for all kinds of reasons.  United States v. Boylan, 898 F.2d 230, 254 (1st Cir.), cert. denied, 498 U.S. 849 (1990).  Similarly, severance is not an automatic entitlement

merely because it would give the defendant seeking it a marginal advantage--at the cost of multiple trials. Zafiro v. United States, 506 U.S. 534, 539 (1993). Here, the evidence in question was of very limited use and the reasons for restricting cross-examination and refusing severance were potent. Tested by the abuse of discretion standard that applies in both instances, United States v. Natanel, 938 F.2d 302, 308 (1st Cir. 1991) (severance), cert. denied, 502 U.S. 1079 (1992); Boylan, 898 F.2d at 254 (cross-examination), the district court is easily sustained.

Finally, two of the defendants say that they were denied proper counsel. The first of these claims arises out of McDonald's request, made approximately 30 days before trial, for a new appointed counsel. Most of the reasons given by McDonald for his request are too slight to require mention; but one rises somewhat above this level: four months before trial, a partner of McDonald's lawyer was appointed Attorney General of New Hampshire. Noting that the state was not a party to the federal prosecution, the district court found McDonald's concern insufficient to justify new counsel.

Objectively, no conflict was created by the appointment but one can imagine situations where, whatever the objective reality, a client might reasonably feel that his relationship

with his counsel was compromised.  We doubt that this is such a case but need not decide the point.  It is enough that the partner's appointment occurred four months before trial, McDonald reserved his concern until it was too late to appoint new counsel without a severance or a delay in a trial already postponed more than once, and no evidence existed of a total breakdown in communication between lawyer and client.  United States v. Allen, 789 F.2d 90, 92-93 (1st Cir.), cert. denied, 479 U.S. 846 (1986).

The other claim regarding counsel is Burke's assertion that his lawyer was ineffective; Burke says that counsel should have moved for a judgment of acquittal on the felon-in-possession counts because no prior felony conviction was proved. In fact, there was testimony as to Burke's record from his parole officer and in any event his counsel reasonably stipulated to a prior conviction to avoid more detailed proof. The claim is thus frivolous.

Sentencing.  The defendants have raised several issues related to sentencing.  The first is formally an attack on the conviction of four of the defendants (all except McGonagle), for carjacking under 18 U.S.C. § 2119, but its significance pertains to sentencing.  The count, framed in the language of the statute as it existed at the time of the crime, charged the four with

the carjacking incident to the Hudson robbery.  To satisfy the "by force and violence" requirement of the statute, the count alleged the assault and murder of the guards.

In describing penalties, the carjacking statute provided that "if death results," imprisonment for a term of years "up to life" shall be imposed (the possibility of a death sentence was later added).  At the time of the trial, we had treated the "if death results" provision as a sentencing matter to be resolved by the judge.  United States v. Rivera-Gomez, 67 F.3d 993, 1000 (1st Cir. 1995).  Accordingly, the district judge did not instruct the jury to find "death" as an element of the carjacking offense but did at sentencing impose life imprisonment on the four defendants on this count.

Thereafter, the Supreme Court ruled in a five-to-four decision that the carjacking statute should be read to create three separate crimes: one where no physical harm occurred, one for "serious bodily injury" and one "if death results."  Jones v. United States, 119 S. Ct. 1215, 1218-28 (1999).  The defendants now argue that their life sentences on this count must be set aside for lack of instructions and a jury finding that death resulted.  In retrospect, the failure to instruct on the "if death results" requirement was "error" under Jones, but it was patently harmless.  The government introduced at

-31-

trial photographs of the dead guards and testimony from the state's assistant deputy medical examiner, who participated in and testified about the autopsies. Witnesses testified that each of the four defendants had admitted that the guards were killed during the robbery, and the defendants did not contest the point. In the words of Neder v. United States, 119 S. Ct. 1827, 1837 (1999), we conclude "beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence," so the error in instruction was "harmless." See United States v. Perez-Montanez, 202 F.3d 434, 442-43 (1st Cir. 2000).

Another claim that involves both convictions and sentence is that of McDonald. He was convicted under separate counts of being a felon-in-possession and a drug user-in-possession with respect to the same firearms, 18 U.S.C. § 922(g)(1), (3), and sentenced concurrently to life imprisonment on the former and 120 months on the latter. Although he made no such objection in the district court, he now says that the two counts are multiplicitous (that is, charge the same offense twice) and that his conviction and sentence twice for the same crime violate the Double Jeopardy Clause.

Since each count involves an element that the other does not, the Double Jeopardy Clause would not bar multiple

convictions and punishments under the familiar Blockburger test. United States v. Peterson, 867 F.2d 1110, 1115 (8th Cir. 1989) (citing Blockburger v. United States, 284 U.S. 299, 304 (1932)). However, as a matter of statutory construction, several circuits have held that Congress did not intend to inflict multiple punishments where a drug-using, former felon possessed a firearm. United States v. Munoz-Romo, 989 F.2d 757, 759 (5th Cir. 1993); cf. United States v. Winchester, 916 F.2d 601, 606-08 (11th Cir. 1990). The government concedes this point and says that the shorter sentence should be vacated (along with the statutory $50 assessment).

However, the government says that the two convictions should stand because no objection was made to the indictment on multiplicity grounds and the objection is therefore waived. Fed. R. Crim. P. 12(b)(2). Whether there is a multiplicity objection is a nice question and arguably depends on attributing a further refinement in intent to Congress; it is clear enough that the government is entitled to get both theories before the jury, whether in one count or two. In all events, we do not treat the multiple "convictions" as clear error.

The law is somewhat clearer that multiple "punishments" are not proper, although the matter was not previously addressed by this court; and while no objection was made at sentencing in

the district court, we accept the government's view that relief should be granted as to the sentence. Since the sentence was concurrent in any event, the only practical effect of following the government's recommendation is to remit the $50 special assessment, but at least the law on this issue will be clear in this circuit in the future.

A different double jeopardy claim is made by Shea to his separate convictions and sentences for carjacking, 18 U.S.C. § 2119, and the use of a firearm during a violent crime, 18 U.S.C. § 924(c). Shea was sentenced, consecutively, to life imprisonment for the first crime and to 240 months imprisonment on the second. The carjacking in question was the Hudson incident and the firearm conviction was for use of a firearm during the same robbery. The claim is foreclosed in this circuit by United States v. Centeno-Torres, 50 F.3d 84, 85 (1st Cir.), cert. denied, 516 U.S. 878 (1995), so we do not discuss it further.

In a pure sentencing issue, O'Halloran and three other defendants (all except McGonagle) object to the court's computation of their sentences insofar as the court relied on a cross-reference to the sentencing guideline for first-degree murder. To understand the objection requires some background. All of the defendants were held liable for various offenses

pertaining to the Hudson robbery and, for purposes of calculating a guidelines sentence, these offenses were grouped as closely related counts under U.S.S.G. § 3D1.2(b). Ordinarily, the offense level for the group would be the base offense level applicable to the highest level crime in the group, modified to reflect any specific offense characteristics. Id. § 3D1.3(a).

However, the robbery guideline, U.S.S.G. § 2B3.1, also provides that "[i]f a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States, apply § 2A1.1 (First Degree Murder)." Id. § 2B3.1(c)(1). The federal murder statute classifies murder as an "unlawful killing . . . with malice aforethought" and then goes on to describe as "murder in the first degree" a set of murders perpetrated in various ways, including "murder . . . committed in the perpetration of . . . robbery." 18 U.S.C. § 1111(a).[2]

_____

[2]18 U.S.C. § 1111(a) provides that "[m]urder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnaping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree."

The district court ruled that this was such a felony murder, making applicable to all of the defendants the very high guideline level for first-degree murder.

On first reading, section 1111 might appear to be unclear and open to the construction that, for first-degree murder, there must be both an unlawful killing "with malice aforethought" (under the first sentence) and satisfaction of one of the other conditions (under the second sentence) such as the commission of that murder in the perpetration of a robbery. However, the case law makes clear that the second sentence is definitional, that the statute was intended to adopt the felony murder rule, and for a stated felony the "malice" element is satisfied by the intent to commit the unlawful felony.[3]

The four defendants argue that the district court had no basis for finding "malice aforethought" and wrongly shifted to the defendants the burden of showing that they did not intentionally cause the death of the guards. However, under the felony murder rule adopted by section 1111's second sentence, the killing of the guards in the Hudson robbery was first-degree

---

[3]See United States v. Nichols, 169 F.3d 1255, 1272 (10th Cir.), cert. denied, 120 S. Ct. 336 (1999); United States v. Harris, 104 F.3d 1465, 1474 (5th Cir. 1997); United States v. Poindexter, 44 F.3d 406, 409-10 (6th Cir.), cert. denied, 514 U.S. 1132 (1995); United States v. Thomas, 34 F.3d 44, 48-49 (2d Cir.), cert. denied, 513 U.S. 1007 (1994).

murder by those who perpetrated the robbery, regardless of who pulled the trigger or any individual intent. The district judge's comments relating to burden appear, in context, to have been an offer to consider a <u>downward departure</u> based on a showing that any individual defendant did not intend to commit murder.[4]

In the end, the district court did grant a downward departure to McGonagle on the ground that the jury, in acquitting him of the carjacking, had established that he was not present when the murders were committed and bore some lesser degree of responsibility--a ruling that the government has not appealed. The other four defendants appeal from the district court's failure to grant them a downward departure, <u>see</u> U.S.S.G. § 2A1.1, cmt. n.1; but the denial of a departure is unreviewable unless the court misapprehends its authority. 18 U.S.C. § 3742(e), (f); <u>United States</u> v. <u>Serrano-Osorio</u>, 191 F.3d 12, 15 (1st Cir. 1999).

In addition to prison sentences, the district court imposed a $250,000 fine on each of the five defendants. The guidelines provide that fines should ordinarily be imposed "except where the defendant establishes that he is unable to pay

---

[4]After referring to the need for "an affirmative showing" by defendants, the court continued "[n]ow if you want a departure, you bear the burden of showing why a departure is justified."

and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). Here, the defendants reported no appreciable assets but the district judge was not persuaded, pointing out that substantial robbery proceeds had not been accounted for and that the defendants might also earn significant sums through interviews and the sale of literary rights. Their objection on appeal is confined to the claim that they lacked an ability to pay.

The district court's determination on ability to pay is a factual one reviewed only for clear error, United States v. Favorito, 5 F.3d 1338, 1339 (9th Cir. 1993), cert. denied, 511 U.S. 1006 (1994), and the burden was on defendants to prove their inability to pay. United States v. Peppe, 80 F.3d 19, 22 (1st Cir. 1996). Here, the fact that the defendants had stolen more than the amount of their fines and failed to account for a substantial portion of the money is enough for us to sustain the district court. That the defendants denied that they had any money created at best a credibility contest and the court was free to disbelieve the self-interested and general denials offered by the defendants.

New trial motion. The final issue pressed on this appeal is the defendants' claim that the district court erred in denying their second motion for a new trial. The background for

the motion was this:  John Burke, Stephen Burke's brother, pleaded guilty during trial to conspiracy to commit a robbery in Seabrook, New Hampshire.  18 U.S.C. § 1951.  The government agreed to dismiss the remaining counts against John Burke at sentencing.  John Burke then testified for the government at trial.

After the remaining five defendants were convicted, the government moved to dismiss the conspiracy charge to which John Burke had pled guilty, and then for unrelated reasons sought to withdraw the motion. Based on what they learned, the defendants then filed a new trial motion asserting that before John Burke had testified against them, he and the government had discussed the possible dismissal of the federal charge against him as a reward for helpful testimony.  This, said the defendants, was dramatic information that should have been disclosed under <u>Brady</u> v. <u>Maryland</u>, 373 U.S. 83 (1963) and <u>Giglio</u> v. <u>United States</u>, 405 U.S. 150 (1972), as useful impeachment evidence.

In fact, nothing in the record indicates that the prosecutor discussed with John Burke prior to his testimony the possible outright dismissal of the federal charge against him. Rather, it appears that John Burke had only the usual generalized expectation that the government would consider some form of leniency or other assistance to him.  On cross-

-39-

examination of John Burke at trial, his hope and desire for some kind of reward was amply established. However, in the post-trial proceedings, the government conceded to the district judge that it had ruled nothing out and was always free to ask for dismissal of all charges or any other benefit.

In a written order resolving the new trial motion, the district court said that the government "although not compelled by Brady" should as a matter of "better practice" have revealed the possible dismissal option "if, before [John] Burke testified, the prosecutors even remotely considered the possibility that they would seek to dismiss all charges against [him] . . . ." However, the district judge ruled that even if this obligation existed, a new trial was not warranted because it was not "reasonably probable" that the disclosure would have altered the verdict. Strickler v. Greene, 119 S. Ct. 1936, 1952 (1999).

Without deciding whether the government was obligated to disclose more than it did (the facts are somewhat idiosyncratic), we find that the district court did not abuse its discretion in denying a new trial. United States v. Wright, 625 F.2d 1017, 1019 (1st Cir. 1980). The evidence against the defendants was substantial and rested on a number of witnesses, much forensic evidence, and a series of admissions and co-

conspirator statements.  Further, John Burke was extensively impeached by questioning about his expectations of lenient treatment, as well as other subjects that might fairly cast doubt on his veracity.  The outcome would not have been changed by "the possibility" of a reward even more generous than usual.

The judgments of conviction and sentence as to each of the defendants is affirmed except that McDonald's sentence on the drug-user-in-possession count, 18 U.S.C. § 922(g)(3), is vacated and remanded to the district court with instructions to merge the sentence with that imposed for the felon-in-possession count, id. § 922(g)(1), and with no separate mandatory assessment fee.

It is so ordered.