**UNITED STATES of America, Plaintiff**

v.

**Davis SANTIAGO SANTIAGO, Defendant**

**No. CIV. 00–152(PG).**

United States District Court, D. Puerto Rico.

Aug. 1, 2001.

Maria T. Arsuaga, Federal Public Defender Office, San Juan, PR, for Davis Santiago–Santiago (1) aka David Santiago–Santiago, defendant.

Nereida Melendez–Rivera, Sonia I. Torres–Pabon, Patricia M. Sulzbach, U.S. Attorney's Office District of P.R., Criminal Division, Hato Rey, PR, for U.S. Attorneys.

## OPINION & ORDER

PEREZ–GIMENEZ, District Judge.

On June 8, 2000 a criminal complaint was filed against defendant charging him of taking with intent to cause death or serious bodily injury a 1992 Toyota Paseo from the person of Neisha de Jesus Colon in violation of 18 U.S.C. 2119(2). During the course of the investigation, the FBI collected various hair, semen and blood samples from the vehicle. The DNA and hair samples extracted from the scene of the crime was then compared to the DNA and hair samples obtained from Defendant. The United States seeks to introduce this evidence at trial.

Now before the Court is Defendant's motion to suppress evidence. In said motion Defendant asks the Court to issue an order "preventing the government from stating, during the trial of this case, the probabilities that DNA material allegedly found at the scene of the crime belong to him [defendant]" and "preventing the Gov-

ernment from stating, during the trial of this case, that hair samples allegedly found at the scene of the crime belong to the defendant or are microscopically consistent with the defendant's hair." According to Defendant the DNA evidence should be excluded because it fails to meet the standard for admissibility enunciated in *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Specifically, Defendant argues that the DNA evidence is not scientifically sound because the database to determine the probability that a person chosen at random from a given population would have a DNA profile identical to that one found at the scene of the crime, is that of Hispanics in the United States and not Puerto Ricans from Puerto Rico. After reviewing the case file and pertinent case law, the Court is ready to rule.

## STANDARD OF ADMISSIBILITY

 A court assessing whether a witness can testify as an expert must ascertain that the witness' opinions are·*reliable* under the Supreme Court's opinion in *Daubert* and *Kumho Tire. Bogosian v. Mercedes–Benz,* 104 F.3d 472, 476, (1st Cir.1997) *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 ·(1999); See also *Bogosian,* 104 F.3d at 476 (where the·First Circuit endorsed a three step analysis when courts evaluate expert testimony under Rule 702 [1]). *Daubert* requires the court to exercise a "gatekeeping" function "to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field". *Kumho Tire,* 526 U.S. at 156, 119 S.Ct. 1167. The purpose of the inquiry is to "rule out subjective belief or speculation". *Porter v. Whitehall Labs., Inc.,* 9 F.3d 607, 614 (7th Cir.1993) (quoting *Daubert,* 509 U.S. at 590, 113 S.Ct. 2786).

 *Daubert's* reliability requirement calls on the district court to evaluate whether the methodology used by the witness is based on the scientific method. See e g., *Daubert II,* 43 F.3d at 1316 (stating that "the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the experts methodology"). The *Daubert* court identified four factors by which reliability of a witness' method may be measured. These are: (1) The extent by which the theory has been or can be tested (2) whether the theory has been subjected to peer review and/or publication (3) the· theory or techniques potential rate of error (4) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community. These four factors are not exclusive. Lower courts have expanded· *Daubert* to encompass other factors. See e g., *Joiner v. General Electric Co.,* 78 F.3d 524, 532 (11th Cir.1996) (Holding that the extensive expertise of the· expert augments the reliability of their reasoning and methodology);

1. The *Bogosian* Court stated that first, the Court has discretion in determining whether the proposed expert is qualified (the analysis performed above). Second, the court decides if the proposed subject matter of the expert opinion properly concerns "scientific, technical or other specialized knowledge" and finally, the court performs the gatekeeping function to ascertain whether the witness' opinion rests on a reliable foundation and is relevant to the facts of the case. There is no controversy as to whether Arndt's testimony concerns scientific or technical knowledge. Thus, the discussion will concentrate on whether Arndt's opinions are reliable.

*Daubert II*, 43 F.3d at 1317 (Stating that courts should consider the fact that an expert developed his opinion expressly for litigation purposes).

■ A district court has discretion to decide what kind of verification is appropriate in a particular case. *Kumho Tire*, 526 U.S. at 150, 119 S.Ct. 1167 (holding that "we neither rule out or rule in the applicability of the factors mentioned in *Daubert*, . . . . Too much depends on the facts of a particular case at issue."). Gauging an expert's usefulness is almost always a case specific inquiry. *U.S. v. Sepulveda*, 15 F.3d 1161, 1183 (1st Cir. 1993).

### DNA EVIDENCE

The DNA profiling process can be divided in three: laboratory procedures, matching and applying principles of population genetics and statistics. *Government of Virgin Islands v. Penn*, 838 F.Supp. 1054, 1059 (D.Virgin Islands 1993). A positive DNA match can only mean two things: either the VNTRs[2] come from the same person (the suspect and the assailant are the same person) or the suspect and the assailant are different persons but by coincidence, the suspect's VNTRs fragment lengths are identical to those of the assailant. *Penn*, 838 at 1063. As part of the DNA profiling process, the testing facility determines the possibility that such coincidence has occurred. The facility utilizes

genetic databases compiled for certain ethnic and racial populations in order to assess the probability that a person chosen at random from a given population would have a DNA profile identical to that of the suspects's. *Id.*

The core of Defendant's argument is that the DNA evidence is not scientifically trustworthy because the database that was used for calculating the probability that the sample obtained in the scene came from another individual is that of Hispanics in general and not that of Puerto Ricans specifically. According to Defendant "a comparison made of the defendant's DNA and DNA found at the scene of the alleged crime, which is based on a comparison of genetic factors which assume that 'Hispanic DNA' is identical to 'Puertorican (sic) DNA', is statistically invalid." See Defendant's *Memorandum of Law in Support of Defendant' s Motion to Exclude* (Dkt.46) at p. 3.

■ Defendant's argument is flawed. To begin with, it is this Court's opinion that Defendants' contentions do not make the evidence inadmissible, but are rather materials to be used during cross-examination. In other words, Defendant's arguments go to the weight of the evidence rather than its admissibility. The *Daubert* decision itself cautions that lower courts should not confuse the role of judge and jury by forgetting that "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the bur-

---

**2.** VNTRs stands for 'variable number of tandem repeats'. VNTRs are a type of the 'anonymous rung sequences'. Recognized rung frequencies, often referred to as genes, determine traits such as hair and eye color. Anonymous rung sequences, on the other hand, are inherited with the recognized rung sequences but are not known to have any effect. Four particular VNTRs found in the genetic code are the focus of the genetic profiling process. These VNTRs have been chosen because ever though everyone has the same core VNTRs

sequence at a particular location on a given chromosome, the number of repetitions of this core sequence at that location varies widely from person to person. The chance of VNTRs occurring with identical lengths in different persons is considerably low. For an extensive discussion on DNA profiling see *Government of Virgin Islands v. Penn*, 838 F.Supp. 1054 (D.Vi.1993) and *Government of Virgin Islands v. Byers*, 941 F.Supp. 513 (D.Vi.1996).

den of proof", rather than exclusion, "are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786; See also *United States v. Shea,* 211 F.3d 658, 668 (1st Cir.2000). Defendant will have an opportunity during the course of the trial to attack the United State's evidence. He will also have an opportunity to present his own evidence or his interpretation of it through his expert witness.

Second, Defendant's argument is not novel and has been rejected by other Courts. In *United States v. Chischilly,* 30 F.3d 1144 (9th Cir.1994), the Court confronted a situation where the defendant, a member of the Navajo tribe, argued that applying the database for "Native Americans" to his DNA would lead to scientifically unsound results since his tribe was underrepresented in the database. Specifically, the defendant argued that "where an individual's DNA sample is tested against samples from a population in which persons of that individual's ethnic group are underrepresented, calculations based on the product rule may tend to understate the probability that a random match would occur between the evidentiary sample and the individual's ethnic group". *Chischilly,* 30 F.3d at 1155. Notwithstanding defendant's arguments, the Chischilly court concluded, just as this Court does today, that "under the *Daubert,* the three chief components of DNA profiling as performed in this case, sample processing, match determination and statistical analysis, pass muster under Rule 702." *Id.* at 1156.

Similarly, in *Government of Virgin Islands v. Byers,* 941 F.Supp. 513 (D.Vi. 1996), the Court confronted a situation where the Byers, a black native of St. Thomas, claimed that DNA evidence was not admissible because the FBI utilized a database for all Blacks in the United States and not specifically for Blacks in St. Thomas. The Court responded by making reference to the 1996 National Research Council (NRC) second report on DNA and an FBI worldwide study evidencing that the existence of subgroups (e.g. Puerto Ricans within the "Hispanic" group) is not forensically significant. The Court stated that "while population subgroups exists, their effects on DNA profiling is not forensically significant." *Byers,* 941 F.Supp. at 523.

The exact same argument was confronted and rejected by another district court siting in the Virgin Islands in *Government of the Virgin Islands v. Penn,* 838 F.Supp. 1054 (D.Vi.1993). In *Penn* another Black man from St. Thomas claimed that DNA evidence was not admissible because the FBI utilized a database for all Blacks in the United States instead of a database that concerned individuals from St. Thomas. The *Penn* court responded to the argument by stating that "any concern that the St. Thomas' black population's bin frequencies are drastically different from those of the United States black population is unwarranted. . . . The danger of error in such application [applying the database of all blacks in the United States to a black man from St. Thomas] is so small as to be practically nonexistent." *Penn,* 838 F.Supp. at 1071.

 Third, the Court is convinced that the DNA analysis performed by the Forensic Science Institute was scientifically sound and, as such, passes muster under *Daubert.* The DNA analysis performed by the Forensic Science Institute was done according to the 1996 guidelines provided by the National Research Council ("NRC")[3]. The NRC is composed of mem-

---

**3.** Other Courts agree that the fact that DNA analysis is accepted by the NRC is strong

bers from the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine [4]. In general, the 1996 NRC report offers a strong endorsement of the DNA profiling process. "The technology for DNA profiling and the methods for estimating frequencies and related statistics have progressed to the point where the reliability and validity of properly collected and analyzed DNA data should not be in doubt". *Byers*, 941 F.Supp. at 522 (quoting The National Research Council, *The Evaluation of Forensic DNA Evidence*, ES–4 (May 2, 1996)). The NRC recommends using the database from the closest related group (e.g. Hispanic) when it is known that the DNA sample came from a specific subgroup (Puerto Ricans) and/or when there is insufficient data for a specific subgroup (e.g. there is no database specifically targeted for Puerto Ricans) [5]. This is exactly what the Forensic Science Institute did in this case.

Additionally, the Court is convinced that when applied to this case, the factors enunciated in *Daubert* point toward inclusion, rather than exclusion of the DNA analysis. Other Courts have written extensively on the matter and thus the Court finds it unnecessary to dwell on the specifics of the test. Suffice is to say that this Court generously adopts the findings of those Courts that, after reviewing the *Daubert* factors, have chosen to deny a defendant's motion for exclusion of DNA evidence. See for e.g. *United States v. Shea*, 159 F.3d 37, 41 (1st Cir.1998); *United States v. Shea*, 957 F.Supp. 331 (D.N.H. 1997); *United States v. Lowe*, 145 F.3d 45, 51 (1st Cir.1998); *United States v. Lowe*, 954 F.Supp. 401 (D.Mass.1996); *Penn*, 838 F.Supp. 1054; *Byers*, 941 F.Supp. 513 (finding that seven out of the eight factors identified by *Daubert and Downing* weigh in favor of reliability); *United States v. Davis*, 40 F.3d 1069, 1074–76 (10th Cir. 1994); *United States v. Chischilly*, 30 F.3d 1144, 1152–58 (9th Cir.1994); *United States v. Bonds*, 12 F.3d 540, 550–68 (6th Cir.1993); *United States v. Martinez*, 3 F.3d 1191, 1195–98 (8th Cir.1993).

### FED. R. EVID. 403

■ Even though the Court has found that the DNA evidence passes muster under Fed.R.Evid. 702, the Court may still exclude the evidence if it finds that it will *unfairly* prejudice the Jury [6]. In his motion, Defendant argues that the prejudicial impact of the proposed DNA evidence out-

---

evidence of its scientific reliability. In *United States v. Shea*, 957 F.Supp. 331, 338 (D.N.H. 1997) the Court stated that "although PCR is a relatively new technology, it is based on sound scientific methods and it has quickly become a generally accepted technique in both forensic and non-forensic settings". Perhaps the strongest evidence on this point is the conclusion reached by the National Research Council's Committee on Forensic DNA Science that "the molecular technology [on which PCR is based] is thoroughly sound and ... the results are highly reproducible when appropriate quality-control methods are followed."

4. According to the American Journal of Law and Medicine, *The Evaluation of Forensic DNA Evidence*, a 1996 report by the NRC

"resolved many of the disagreements surrounding the conclusiveness of DNA evidence."

5. In Recommendation 4.4 the NRC states that "if the person who contributed the sample is from a group or tribe for which no adequate database exists, data from several other groups or tribes thought to be closely related to it should be used". *The Evaluation of Forensic DNA Evidence* at 123 (1996).

6. Fed R. Evid. 403 provides in relevant part that "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...."

weighs its probative value because "with DNA identification having been accepted by the American Legal System, the general public has come to firmly believe that DNA identifications are scientifically based and that they are conclusive". *See Defendants' Memorandum in Support of Motion to Exclude* at p. 10.

■ Trial courts have significant leeway in determining whether to admit or exclude evidence under the aegis of Rule 403. *Williams v. Drake*, 146 F.3d 44, 47 (1st. Cir.1998) quoting *Daigle v. Maine Med. Ctr., Inc.*, 14 F.3d 684, 690 (1st Cir.1994). The Court is mindful of the fact that lay persons may get overly impressed with scientific data and hastily sentence a defendant without pause. "Because of its apparent objectivity, an opinion that claims a scientific basis is apt to carry undue weight with the trier of fact". *United States v. Brady*, 595 F.2d 359, 362 (6th Cir.1979). "For a lay person,...it is easy to conceive that this same science [DNA] that can reveal the genetic secrets of the living, the dead, and the unborn is potent enough to solve the most perplexing crime." *Byers*, 941 F.Supp. at 527. (emphasis theirs). "There is something very primal about DNA and genetic science that lends itself to a posture of mythic infallibility". *Id.*

Nonetheless, this Court is of the opinion that there must be something more than a simple aversion by the Defendant for the Court to exclude what has proven to be very useful and reliable evidence. There are safeguards readily present and available to a defendant. He has the ability to cross-examine the expert witness and present his own expert witness. Defense counsel has the opportunity of presenting his interpretation of the evidence during opening and closing statements. The Court, through jury instructions, has some measure of control over what jurors extrapolate from the evidence.

■ In the end, the Court has balanced the possible prejudices that emanate from presenting DNA evidence to lay persons with the obvious beneficial consequences that derive from presenting such evidence. There is no question that the jury will benefit from the DNA evidence. As a result of the evidence, the jury will have a better idea of whether the Defendant was present at the scene of the crime and/or whether it was his sperm that was found in the victim's vaginal area. The evidence's probative value outweighs its prejudicial effect. The Court sides with those Courts that have refused to exclude DNA evidence on Fed.R.Evid. 403 grounds. *See e.g. Lowe*, 954 F.Supp. 401 (D.Mass.1996) *affirmed by Lowe*, 145 F.3d 45 (1st Cir.1998); *United States v. Shea*, 957 F.Supp. 331 (D.N.H.1997) *affirmed by Shea*, 159 F.3d 37, 41 (1st Cir.1998).

### HAIR SAMPLE EVIDENCE

In his motion, Defendant further argues that hair comparison evidence should be excluded as being scientifically unreliable. To support his argument defendant extensively cites *Williamson v. Reynolds*, 904 F.Supp. 1529 (E.D.Okla.1995). In that case, the district court applied the *Daubert* test to hair comparison analysis and determined that the evidence failed to be scientifically reliable.

Although *Reynolds* was later affirmed by the Tenth Circuit, it was affirmed based on grounds other than the admissibility of the hair evidence. *Williamson v. Ward*, 110 F.3d 1508, 1510 (10th Cir.1997). In fact, the Tenth Circuit specifically reversed the ruling on the issue of the hair evidence asserting that the court applied the incorrect standard in making its ruling. *Id.* at 1522–23. In *Ward*, the court held that the district court "did not perform its

analysis under a due process/fundamental fairness standard. Instead, it incorrectly assessed the issue in evidentiary terms under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)".

■ Upon independent research, the Court finds that the principles and procedures underlying hair and fiber evidence are overwhelmingly accepted and reliable. As one treatise notes, "[t]he cases in which courts have excluded hair evidence are so rare that they have literally amounted to only a handful of precedents.... In contrast to the few cases excluding hair evidence, a large body of case law reflects the courts' receptivity to hair analysis". Giannelli & E. Imwinkelried, *Scientific Evidence* §§ 24–3, at 360–61. *See also* G. Sarno, *Annotation—Admissibility and Weight, in Criminal Case, of Expert Testimony or Scientific Evidence Respecting Characteristics and Identification of Human Search Term Begin Hair Search Term End*, 23 A.L.R.4th 1199 (1983) quoted by *State v. Fukusaku*, 85 Hawai'i 462, 946 P.2d 32 (1997). The overwhelming majority of courts that have dealt with the issue have found hair comparison evidence to be reliable. See e.g. *United States v. Hickey*, 596 F.2d 1082, 1089 (1st Cir.1979); *United States v. Brady*, 595 F.2d 359, 362–63 (6th Cir.1979), *United States v. Cyphers*, 553 F.2d 1064, 1071–73 (7th Cir. 1977); *Jent v. State*, 408 So.2d 1024, 1028–29 (Fla.1981); *Robinson v. State*, 18 Md. App. 678, 308 A.2d 734, 744–45 (1973); *Commonwealth v. Tarver*, 369 Mass. 302, 345 N.E.2d 671, 676–77 (1975); *State v. White*, 621 S.W.2d 287, 292–93 (Mo.1981); *People v. Allweiss*, 48 N.Y.2d 40, 421 N.Y.S.2d 341, 396 N.E.2d 735 (1979); *State v. Green*, 305 N.C. 463, 290 S.E.2d 625, 629–30 (1982). This Court chooses to side with the majority of jurisdictions.

■ Defendant further argues that hair comparison evidence is unduly prejudicial and thus inadmissible under Fed. R.Evid. 403. Although this Court is certain that the probative value of hair comparison evidence greatly outweighs its prejudicial effect, it does not need to dwell on the matter as the First Circuit Court of Appeals has already ruled on the issue. In *Hickey*, 596 F.2d at 1089 the Court states that:

> Ferreira argues that this evidence should have been excluded, on the ground that the danger of prejudice resulting from its admission outweighed its probative value. See Fed.R.Evid. 403. We disagree. It was brought out by the witness that hair identifications, unlike fingerprint identifications, do not point to just one individual as the source. The jury was made well aware of the limitations of this evidence. On the other hand, the link between the sweater and mask and the robbery was strong, and the similarity of the hairs, while not affirmatively implicating Ferreira, "enhanced the probability of guilt" and was therefore probative.

*Hickey*, 596 at 1089. Just as in *Hickey*, it is this Court's ruling that the introduction of hair evidence, while not affirmatively implicating the Defendant, will help the jury in determining whether Defendant committed the crimes. Hair comparison evidence is probative.

For all of the above reasons, Defendant's motion to exclude evidence is **DENIED.**

**IT IS SO ORDERED.**